# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

EULICE CANUP,                              :

        Plaintiff,                    :
                                     Case No. 3:08cv00106

  vs.                                       :

                                     District Judge Walter Herbert Rice

MICHAEL J. ASTRUE,                     :     Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,                  :

        Defendant.                    :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.      INTRODUCTION

      The Social Security Administration provides Disability Insurance Benefits ["DIB"] to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability."[2]

      Various health problems have led Plaintiff Eulice Canup to file for DIB on three

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

[2] *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Serv.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

occasions. His first two DIB applications were denied during the early stages of administrative review. (Tr. 37-39, 41, 63-67, 68-70, 71, 85-89). He did not appeal those denials and his first two DIB applications are not at issue in this case.

Canup filed his third DIB application in August 2002. He asserted that he was under a disability and unable to work beginning July 19, 2000. (Tr. 415-17). His application was denied at each stage of administrative review. The most significant stage for purposes of this case involves two hearings before Administration Law Judge ["ALJ"] Melvin A. Padilla. On May 18, 2006, ALJ Padilla issued a written decision finding that Canup was not under a "disability" as defined by the Social Security Act, and hence was not eligible for DIB. (Tr. 15-31).

The ALJ's decision later became the final determination of the Commissioner of the Social Security Administration. Such final determinations are subject to judicial review, *see* 42 U.S.C. §405(g), which Canup now is due.

The case presently is before the Court upon Canup's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #10), the administrative record, and the record as a whole.

Canup seeks at a minimum a remand of this case to the Social Security Administration to correct certain alleged errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II.    ADDITIONAL BACKGROUND

Canup was 46 years old when the ALJ issued his decision, and thus is considered a "younger person" for purposes of resolving his DIB claim. *See* 20 C.F.R. § 404.1563(c); (*see also* Tr. 29). Canup earned a high school graduate equivalency diploma. 20 C.F.R. § 404.1563(b)(4); *see* Tr. 444.

Canup's past employment involved work as an automotive parts assembler, a convenience store clerk, a truck driver, and a gas station manager. (Tr. 439).

Canup testified during the August 9, 2005 hearing that he can't work, "[b]ecause

I'm not able to do anything. Like I can't even vacuum a floor, let alone work all day."
(Tr. 674). He claimed he had difficulty with his back, breathing and numbness in his hands. (*Id.*). Canup further testified that he used a breathing machine twice a day and an over-the-counter inhaler because he cannot afford the prescribed ones. (Tr. 675). Canup testified that he had reduced his smoking from three packs to one-half pack per day. (*Id.*). Canup also testified that he has been insulin-dependent since he was diagnosed with diabetes in 1994, but he also explained that insulin has not controlled his blood sugar. (Tr. 686-87). He complained of diabetic neuropathy in his feet, legs, arms and hands. (Tr. 688).

Canup further testified that he cannot exercise due to back and leg problems. (Tr. 677). He described his back pain as constant and excruciating, going down the middle of his back between his shoulders to his tailbone. (Tr. 675-76). He tried physical therapy but his insurance benefits ran out. He is not allowed to have spinal injections for pain due to his diabetes. He uses Advil for the pain. (Tr. 676). He also has trouble using his hands and cannot use hand tools anymore. (Tr. 689).

As to his daily activities, Canup testified that he naps a couple of hours each day. (Tr. 680). He tries to help with household chores but can't vacuum or bend to get clothes out of the dryer. (Tr. 681). He has given up most hobbies. (Tr. 683). He goes grocery shopping but has to stop a lot because of his breathing. (Tr. 691-92). He tries to help his wife cook and wash dishes. (Tr. 680-81). He uses a computer at home infrequently but cannot not type, *id.*, and he goes out to eat once in a while.

Canup estimated that he could walk 20-30 feet without shortness of breath. He thought he could stand for 10 minutes, but noted that he cannot stand long enough to do the dishes. He could not lift a 12-pack of soda or sit for about 45 minutes before he needs to change positions. (Tr. 678). He had no medication side effects. (*Id.*). He does not climb stairs because it hurts his lungs. Canup reported that shoes make his feet burn, so he wears sandals. (Tr. 679). Canup testified that he has constant numbness on his left

side, into his left foot and arm.

At the second hearing, on March 6, 2006, Canup testified that his breathing problems had worsened in the prior six months. (Tr. 707). He stated that he no longer could help around the house. (Tr. 707-08). His feet continued to be numb when he wore shoes. (Tr. 707). He had trouble with fatigue just from taking a shower. He noted that he has even had asthma attacks while showering. Canup further testified that he would get exhausted by just changing his clothes. (Tr. 709). He testified that the numbness in his hands was worse and that he can use his right hand only a little and cannot even open a pop can with it. (Tr. 710-11).

The remaining significant information in the administrative record consists of medical records and the opinions of several medical sources.

Canup was seen by Dr. Bennett, his primary care physician from 1996 through 2004, for treatment of diabetes, breathing problems, and back and joint pain. (Tr. 563-618). From 1999 through 2002, Dr. Bennett completed many disability forms in which she opined that Plaintiff was disabled due to pain in his low back, hip, knees and foot; COPD; and diabetic peripheral neuropathy. (Tr. 343-82, 511, 586, 627-30). On February 20, 2003, Dr. Bennett reported that Plaintiff suffered from severe COPD, uncontrolled diabetes mellitus, depression, diabetic neuropathy and osteoarthritis. She concluded that "[h]e is unable to work." (Tr. 510).

Plaintiff saw his treating pulmonologist, Dr. Bellus, for breathing problems in November 1999. At that time, he continued to smoke two packs of cigarettes per day, reduced from four. (Tr. 134). On May 31, 2000, Plaintiff was seen for shortness of breath, cough and wheezing. He smoked one and one-half packs of cigarettes per day. Dr. Bellus assessed an acute exacerbation of COPD/emphysema and bronchitis, severe tobacco abuse disorder and chronic rhinitis. Plaintiff was given inhalers and encouraged to quit smoking. (Tr. 131-33). On October 19, 2000, Dr. Bellus noted that an echocardiogram suggested mild aortic stenosis, comparable to a study done a year earlier.

Based on the stable study, no further treatment was deemed warranted as "long as the patient remains clinically stable." (Tr. 130).

The record also contains the opinions of several non-treating medical professionals. Dr. Danopulos, a state agency physician, examined Canup on August 21, 2001. (Tr. 201-21). Canup reported shortness of breath, diabetes, hepatitis, right hip and leg pain, and burning in his ankles and feet. Canup also reported that he had smoked two packs per day for 15 years. Upon examination, Dr. Danopulos noted that Canup's lungs revealed wheezing to auscultation and percussion. Pulmonary function studies showed a moderate degree of obstructive and restrictive lung disease with positive bronchodilator effect. Canup's pre-bronchodilator forced vital capacity ["FVC"] was 60% of predicted; post-bronchodilator was 71% of predicted. The lower dorsal spine was painful to pressure. Canup had full range of leg motion, no joint abnormality, no trophic changes, edema or stasis changes, no ulceration, normal gait and straight leg raising, and "no evidence of nerve root compression or peripheral neuropathy." (Tr. 204). Reflexes, motor strength and sensation were normal. Dr. Danopulos concluded that Canup had moderately severe emphysema, asthma, mature onset insulin-dependent diabetes with clinical symptoms of early diabetic neuropathy, and mild lumbosacral osteoarthritis. Dr. Danopulos noted that Canup's "ability to do any work-related activities is affected and restricted from all of the above." (Tr. 205).

On March 7, 2003, Dr. Danopulos again examined Canup. (Tr. 512-21). Canup reported that he had cut his cigarette consumption to ½ pack per day "for the last 3 months." (Tr. 513). Canup's lungs showed wheezing on auscultation. Chest excursions were diminished and expiration was prolonged. On musculoskeletal examination, the spine was painful to pressure from the mid-dorsal to the lumbosacral area. Lumbar spine motions were restricted and painful. X-rays showed facet arthrosis at L5-S1. Chest x-ray was normal. (Tr. 513-15).

Dr. Danopulos diagnosed lumbar spine arthritis, insulin-dependent poorly

controlled diabetes with clinical suggestion of diabetic neuropathy, history of asthma, moderately severe emphysema, obesity and chest pain. (Tr. 515). Dr. Danopulos concluded that Canup's ability to engage in work-related activities was affected mainly by his moderately severe emphysema, "which may not allow him to perform jobs which require very much walking." (*Id*.).

Six weeks later, on April 25, 2003, Dr. Danopulos performed a pulmonary function study. (Tr. 539-50). The study showed a severe degree restrictive and moderate degree of obstructive lung disease with positive bronchodilator effect. The FVC before bronchodilator was 1.767, or 40 percent of normal. After bronchodilator, the FVC was 2.487, or 57 percent of normal. The FEV1 was 1.036 (30 percent of normal) and 1.691 (48 percent of normal), before and after bronchodilator, respectively. Dr. Danopulos reported that during pulmonary function testing, Canup was inconsistent in his effort, "mainly after" bronchodilation, but he had severe restrictive and moderate obstructive lung disease. (Tr. 539-50).

On September 4, 2001, Dr. Starr, a state agency reviewing physician, opined that Canup could lift 50 pounds occasionally and 25 pounds frequently, and could sit, stand and walk for six hours each in an eight-hour workday. He noted that while Canup claimed to be unable to work due to back pain, he "fell off ladder in November 2000, while putting up Christmas lights." (Tr. 222-30).

Dr. Hofmann performed a consultative orthopedic evaluation of Canup on September 14, 2001. Canup complained of back pain that radiated down his right leg, associated with tingling in the third, fourth and fifth toes of his right foot. Examination showed tenderness on palpation throughout the lumbar and mid-thoracic spine. Range of motion of the lumbar spine was painfully restricted. Straight leg raising was positive for gluteal pain on the right. There was apparent extensor weakness of the right big toe and ankle when compared with the left. Patellar tendon reflexes were absent bilaterally. There was a relative sensory deficit to slight touch over the lateral aspect of the right calf.

Dr. Hofmann reviewed diagnostic tests including CT scans and x-ray of the lumbar spine, which were unremarkable. Dr. Hofmann concluded that Canup has symptomatic mid-thoracic degenerative disc disease along with chronic low back pain of uncertain etiology. He said Canup was "disabled for doing his work as a production worker for at least the next six months." (Tr. 619-22).

Dr. Chunduri, an internist, consultatively examined Canup relative to diabetes on November 7, 2001. On examination, he noted that breath sounds were decreased bilaterally although there was no wheezing. He noted decreased sensation in both feet, although his peripheral pulses were fairly well felt. The lumbar spine showed decreased range of motion with pain. Canup's blood sugar was at 145 and glycohemoglobin was 10.4. Canup's liver function was "surprisingly normal." Dr. Chunduri diagnosed diabetes mellitus in poor control with peripheral neuropathy. He also noted chronic joint pain and chronic hepatomegaly (enlarged liver). He opined that Canup could return to work in one or two months if his diabetes were under better control. (Tr. 624-26).

State agency reviewing physician Dr. Stock opined on April 30, 2002, that Canup could perform medium work, but should avoid concentrated exposure to environmental pollutants. (Tr. 311-19).

On October 27, 2002, Dr. Rath, a state agency reviewing physician, opined that Canup had moderate COPD, mild degenerative changes in the spine, and poorly controlled diabetes, but adequate kidney function. Canup could lift 50 pounds occasionally and 25 pounds frequently, and sit, stand and walk for six hours each in an eight-hour workday, occasionally balance, kneel and crawl, and should avoid concentrated exposure to pulmonary irritants. (Tr. 504-09).

Dr. McCloud, another state agency reviewing physician, opined on May 29, 2003, that Canup could lift 20 pounds occasionally and 10 pounds frequently, and sit, stand and walk for six hours each in an eight-hour workday. Dr. McCloud noted that posturally, Canup could balance, stoop, kneel, crouch or crawl only occasionally. Canup should

avoid all exposure to fumes, odors, dusts and gases. Dr. McCloud did not note any manipulative limitations. (Tr. 551-56). On June 18, 2003, Dr. Evers, another reviewing physician agreed with the limitations Dr. McCloud assessed. (Tr. 558-59).

On June 17, 2003, Dr. Nimmagadda reviewed Canup's pulmonary function studies. Noting that Plaintiff had no hospital or emergency visits for 12 months, he concluded, from a pulmonary perspective, that a light RFC with no concentrated exposure to gases or fumes was reasonable. (Tr. 561).

Canup underwent another pulmonary function study on September 30, 2005. Canup obtained a forced vital capacity ["FVC"] of 2.01 before bronchodilator (47 percent of predicted) and 2.30 after bronchodilator (55 percent of predicted). The FEV1 was 1.24 before (38 percent of predicted) and 1.52 after bronchodilator (46 percent of predicted). Dr. Fritzhand diagnosed a severe chronic obstructive pulmonary disease with moderately severe restrictive and moderate bronchospastic components. (Tr. 632-37). Based on the pulmonary problems only, Dr. Fritzhand indicated that he believed Canup could lift 10-15 pounds only occasionally. He noted that Canup could not walk or stand for more than 2 hours total in an 8-hour day and for only 15 minutes at a time. Dr. Fritzhand indicated that Canup was restricted from temperature extremes, chemicals, dust, fumes and humidity. (Tr. 638-40).

The ALJ sent Canup for further evaluation with Dr. Koppenhoefer on November 21, 2005. Canup stated he could not work due to back pain, radiating to his legs, with numbness. He had been controlling his diabetic neuropathy for three years. Dr. Koppenhoefer observed that Canup's gait showed a wide base of support. Range of motion of the lumbar spine was reduced. Manual muscle testing showed give away responses. Dr. Koppenhoefer reviewed some of the medical records. Based on these records and his examination, Dr. Koppenhoefer indicated that Canup would be limited to lifting 20 pounds occasionally and 10 pounds frequently, given the combination of his diabetic polyneuropathy and his degenerative changes. Dr. Koppenhoefer also felt that

standing and walking were limited by diabetic neuropathy. Sitting was not limited except that Canup should be able to change positions for comfort. Dr. Koppenhoefer noted postural limitations to occasional kneeling, crouching, crawling and stooping. Dr. Koppenhoefer noted handling and gross manipulation would be limited to occasional, due to polyneuropathy. Dr. Koppenhoefer also noted that Canup would have environmental limitations due to his pulmonary problems. (Tr. 641-51).

After the first administrative hearing, Canup's attorney sent him to Dr. O'Connell for a consultative examination on April 4, 2006. (Tr. 652-63). Examination revealed Canup had spider hemangiomas on his torso and a rash on the palms of both hands, indicative of a hepatic condition. There also was ascites of the abdomen with a fluid wave. There was 2+ pitting peripheral edema bilaterally in the lower extremities and pulses were decreased bilaterally at the ankle and foot. Canup's abdomen showed an enlarged tender liver. His lungs were clear, but exhibited very shallow respirations with poor filling to the base. Canup also showed decreased sensation in a glove and stocking pattern from the bilateral wrist to hand, and ankle to feet. There was decreased two-point discrimination in the bilateral hands and feet, and decreased vibratory sense in the bilateral hands and feet. Canup's gait was antalgic with a wobble that was unstable rolling from heel to toe.

Dr. O'Connell documented her medical records review in her report. Based on Canup's history and her physical examination and review of the medical records, Dr. O'Connell diagnosed insulin dependent diabetes mellitus not well controlled; diabetic peripheral neuropathy; diabetic nephropathy; COPD with emphysema; lumbar degenerative joint and disc disease; spondylosis of the thoracic spine; chronic hepatomegaly, unknown etiology; aortic stenosis with mitral valve insufficiency; hypertension; and poor healing secondary to uncontrolled diabetes.

Dr. O'Connell concluded that Canup's multiple impairments prevented him from performing substantial gainful activity on a competitive basis. She opined that he had

been disabled since July 19, 2000. And she claimed that he met Listing 9.08 for diabetes and Listing 3.02 for pulmonary insufficiency. (Tr. 658). Dr. O'Connell claimed peripheral neuropathy affected Canup's gait and station, and caused sensory disturbance. She also opined that Canup's FEV scores of 1.036 and 1.24 met the criteria for Listing 3.02. (*Id*.).

Dr. O'Connell did not think that Canup could lift more than 10 pounds occasionally or five pounds frequently. (Tr. 660). She did not think that Canup could stand or walk for more than 2 hours in an 8-hour workday, and for only 15 minutes at a time. (*Id*.). Dr. O'Connell thought that Canup could sit for up to 4 hours a day, but for only 1 without interruption. (*Id*.) Dr. O'Connell did not think that Canup should ever climb, balance, stoop, crouch, kneel or crawl. She thought that reaching, handling, feeling, and pushing/pulling would all be limited. She also noted environmental limitations. Dr. O'Connell concluded that Canup could not perform even sedentary work on a sustained basis. (Tr. 652-63).

## III.     THE "DISABILITY" REQUIREMENT AND ADMINISTRATIVE REVIEW

Narrowed to its meaning under the Social Security Act, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70.

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. (*See* Tr. 16-17); *see also* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.      Is the claimant engaged in substantial gainful activity?

2.      Does the claimant suffer from one or more severe impairments?

3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6ᵗʰ Cir. 2001).

In the present case, the ALJ determined at Step 1 of the sequential analysis that Canup had not engaged in any substantial gainful activities at any time since his alleged onset date of July 19, 2000. (Tr. 19). At Step 2 the ALJ determined that Canup suffered from the severe impairments of restrictive and obstructive pulmonary disease, poorly controlled diabetes mellitus with mild peripheral neuropathy, degenerative disc disease in the lumbar spine, obesity, and depression. (*Id.*).

The ALJ concluded at Step 3 that Canup did not meet or equal the criteria of the Listings. (Tr. 20).

At Step 4 the ALJ assessed Canup's Residual Functional Capacity ["RFC"] as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift up to twenty pounds occasionally and ten pounds frequently; he must have the option to alternate positions at will; he must avoid climbing ladders, working at unprotected heights, or balancing; use of foot controls; more than occasional kneeling, crawling, crouching or stooping; he must work inside in a clean-air, temperature-controlled environment; and he is limited to jobs that are not fast paced and do not require dealing with the public.

(Tr. 21). The ALJ also determined at Step 4 that while the Canup has severe impairments, his statements concerning intensity, duration and limiting effects of these impairments were not entirely credible. (Tr. 28). The ALJ further concluded at Step 4 that Plaintiff was unable to perform his past relevant work. (Tr. 29).

The above conclusions, along with the ALJ's findings throughout his sequential evaluation, led him to conclude that Canup was not under a disability and hence not eligible for DIB.

## IV.  JUDICIAL REVIEW

Judicial review determines whether substantial evidence in the administrative record supports the ALJ's factual findings. *Bowen v. Commissioner of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "'more than a scintilla of evidence but less than a preponderance...'" *Rogers v. Commissioner of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review for substantial evidence is deferential, not *de novo*. *See Cruse v. Commissioner of Soc. Sec.* 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). An ALJ's factual findings must be upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her v. Commissioner of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)). Once substantial supporting evidence is found in the administrative record, courts do not consider whether they agree or disagree with the ALJ's findings or whether the administrative record contains contrary evidence. *Rogers*, 486 F.3d at 241; *see Her*, 203 F.3d at 389-90.

Substantial evidence is not the analytical ending point. Judicial review further considers whether the ALJ "applied the correct legal criteria." *Bowen*, 478 F.3d at 746. If the ALJ does not, the decision may not be upheld even if the findings are supported by

substantial evidence. *See id.* For example, a decision will not be upheld where the ALJ failed to apply mandatory procedural rules and standards established by the Commissioner's Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See id.* (and cases cited therein).

## V.     DISCUSSION

### A.     Listing 3.02A and Combination of Impairments

Canup contends that the ALJ erred by failing to consider whether the combination of Canup's impairments equaled Listing 3.02A, describing Chronic Pulmonary Deficiencies. Canup emphasizes that "[n]owhere in [the ALJ's] discussion of Listing 3.02 does the administrative law judge consider Mr. Canup's other impairments." (Doc. #9 at 14).

"The Social Security Act requires the Secretary [now, the Commissioner] to consider the combined effects of impairments that individually may be nonsevere, but which in combination may constitute a medically severe impairment or otherwise evince a claimant's disability. *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988) (citing 42 U.S.C. §423(d)(2)(C)). The ALJ's decision in the present case complied with this statutory mandate.

As noted above, the ALJ found at Step 2 of the sequential evaluation that Canup suffered from severe impairments including "restrictive and obstructive pulmonary disease, poorly controlled diabetes mellitus with mild peripheral neuropathy, degenerative disc disease in the lumbar spine, obesity and depression" (Tr. 19). The ALJ then listed all the medical evidence which established Canup's impairments. (Tr. 19-20). The ALJ's consideration of multiple severe impairments and his use of the plural "impairments" strongly indicates his consideration of Canup's impairments in combination at Step 2.

At Step 3, the ALJ determined that Canup "does not have an impairment or **combination of impairments**" that meets or equals the severity of a listing-level

impairment. (Tr. 20)(emphasis added). This conclusion reflects that the ALJ considered the combined impact of Canup's impairments on his work abilities, not only because the ALJ plainly referred to the "combination of impairments" – plural – but also because he reached this conclusion as part of his consideration of the medical evidence of record concerning Canup's multiple impairments (both physical and mental), and Canup's testimony during the administrative hearing. (*See* Tr. 17-21); *see also Foster*, 853 F.2d at 490; *cf. Loy v. Sec'y of Health & Human Serv.*, 901 F.2d 1306, 1310 (6th Cir. 1990) (ALJ's specific reference at Step 3 to claimant's "combination of impairments" satisfied ALJ's duty to consider combined impact of impairments).

In support of his determination that Canup did not meet Listing 3.02A, the ALJ cited the opinions of Dr. McCloud and Dr. Nimmagadda, state agency reviewing physicians, who concluded after reviewing the record – including Dr. Danopulos' 2003 pulmonary function study – that Canup did not meet or equal a listed impairment. (Tr. 21; *see* Tr. 551-56, 561). As the Commissioner noted, reviewing physicians' opinions constitute expert medical opinions and provide substantial evidence supporting the ALJ's finding that Canup did not meet or medically equal Listing 3.02. 20 C.F.R. §404.1527(f)(2). (*See* Doc. #10 at 12).

Accordingly, Canup's challenges to the ALJ's decision at Step 3 of the sequential evaluation lack merit.

**B.    Medical Source Opinions**

Canup contends that the ALJ erred by rejecting the disability opinion of his long-treating physician Dr. Bennett, which was supported by the opinions of Dr. Fritzhand. Canup further asserts that the ALJ erred in relying on the opinions of Drs. Danopulos and Koppenhoefer rather than relying on the opinions provided by Dr. O'Connell.

The treating physician rule, when applicable, requires ALJs to place controlling weight on a treating physician's opinion rather than favoring the opinion of a nonexamining medical advisor, or an examining physician who saw a claimant only once,

or a medical advisor who testified before the ALJ. *Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see Lashley v. Sec'y of Health & Human Serv.,* 708 F.2d 1048, 1054 (6th Cir. 1983); *see also* 20 C.F.R. §404.1527(d)(2), (e), (f). A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. *Wilson*, 378 F.3d at 544; *see Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997); *see also* 20 C.F.R. §404.1527(d)(2).

If a treating physician's opinion is not given controlling weight, then it must be weighed against other medical source opinions under a number of factors set forth in the Commissioner's Regulations – "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. § 404.1527(d)(2)).

In general, more weight is given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. § 404.1527(d)(1). However, the opinions of non-examining state agency medical consultants have some value, and under some circumstances can be given significant weight. This occurs because the Commissioner views nonexamining sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180 at *2. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as those of treating physicians, including supportability, consistency and specialization. *See* 20 C.F.R. § 404.1572(d), (f); *see also* Ruling 96-6p at *2-*3.

Canup points out that the only treating physician opinion in the record was presented by his long-term primary care physician, Dr. Bennett. In February 2003 Dr.

Bennett reported that Canup suffered from severe COPD, uncontrolled diabetes mellitus, depression, diabetic neuropathy and osteoarthritis, concluding that "[h]e is unable to work." (Tr. 510). The ALJ rejected Dr. Bennett's disability opinion by finding in unsupported by objective evidence from specialists and unsupported by substantial clinical evidence of dysfunction in terms of musculoskeletal impairments. (Tr. 25).

Although Dr. Bennett diagnosed Canup as suffering from COPD, uncontrolled diabetes mellitus, depression, diabetic neuropathy and osteoarthritis (*e.g*, Tr. 343-82, 511, 586, 627-30), a treating physician's diagnosis is not by itself determinative of the ultimate disability determination. *See Simons v. Barnhart*, 114 Fed. Appx. 727, 733-34 (6th Cir. 2004); *see also Landsaw v. Sec'y of Health & Human Serv.*, 803 F.2d 211, 213 (6th Cir. 1986); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."). Although the Regulations required the ALJ to consider Dr. Bennett's opinion, the ALJ did so and provided sufficient reasons for rejecting it. The ALJ discussed Dr. Bennett's opinion and records at length. (Tr. 24-26). He specifically stated that Dr. Bennett's opinions of disability are rejected as unsupported by the evidence of specialists or by clinical evidence of dysfunction, and the ALJ further explained that the evidence showed only mild diabetic neuropathy in the record based on Canup's 2001 EMG study. (Tr. 25). The ALJ also considered that Dr. Bennett "saw the claimant occasionally since 1996 and generally stopped seeing him on or about September 2002." (Tr. 24). While there were visits after 2002, "no significant evaluation [was] indicated" (Tr. 24). The ALJ's decision therefore contains a good explanation of why he rejected Dr. Bennett's unsupported disability opinion.

Canup next contends that the ALJ overlooked and failed to properly weigh the opinion of Dr. Fritzhand. In September 2005 Dr. Fritzhand performed a pulmonary function study of Canup. The results showed a FVC of 2.01 before bronchodilator and 2.30 after bronchodilator. The FEV1 was 1.24 before and 1.52 after bronchodilator.

Based only on the pulmonary problems, Dr. Fritzhand indicated that he believed Canup could lift 10-15 pounds only occasionally. He noted that Canup could not walk or stand for more than two hours total in an eight-hour day and for only 15 minutes at a time. Dr. Fritzhand indicated that Canup was restricted from temperature extremes, chemicals, dust, fumes and humidity. (Tr. 638-40). The ALJ noted the results of the pulmonary function study on September 30, 2005 (Tr. 21), but the ALJ did not weigh Dr. Fritzhand's opinion. *See* Tr. 19-26. To the extent this constituted an error, *cf. Bowen*, 478 F.3d at 746-47, the error was harmless. Dr. Fritzhand acknowledged that the answers to the medical assessment he completed were based solely on the results from Canup's September 30, 2005 pulmonary testing. (Tr. 638). Dr. Fritzhand did not examine Canup or take a history. (*Id.*). In addition, even if Dr. Fritzhand's findings were fully credible, the vocational expert testified that a significant number of light jobs existed that a person with the limitations set by Dr. Fritzhand could perform. *See* Tr. 718.

Canup next argues that the ALJ improperly rejected the opinion of Dr. O'Connell, a one-time examining physician, who opined that Canup could not perform even sedentary work on a sustained basis. (Tr. 663). The ALJ did not err by concluding that Dr. O'Connell's opinion was not entitled to controlling weight because it was not adequately supported and was inconsistent with the other reliable evidence in the record. The ALJ also explained that Dr. O'Connell's opinion was not entitled to any significant weight because she was a pain management practitioner, not an orthopedic specialist and not a treating source, with no known board certification in any medical specialty, and her practice does not include treating diabetes or pulmonary conditions. (Tr. 26). This consideration of the specialization factor is consistent with the Regulations, 20 C.F.R. §404.1527(d)(5), and is supported by substantial evidence record.

Canup also urges in his Statement of Errors that the ALJ "substituted his own lay opinion for that of the medical experts," making his assessment of Canup's RFC "fatally flaw[ed]." (Doc. #9 at 18). "[A]n ALJ must not substitute his own judgment for a

physician's opinion without relying on other evidence or authority in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *see also Meece v. Barnhart*, 192 Fed Appx. 456, 465 (6th Cir. 2006)("the ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence). In Canup's case, the ALJ did not commit this error. He discussed and relied on various medical source opinions of record at Steps 2 through 4 of his sequential evaluation. *See* Tr. 22-26. By doing so, the ALJ did not substitute his own lay opinion in place of medical source opinions on medical issues.

Accordingly, Plaintiff's challenges to the ALJ's evaluation of the medical source opinions lack merit.

### C.     Pain, Other Symptoms and Credibility

Pain or other symptoms may be severe enough to constitute a disability, if caused by a medical impairment. *See Kirk v. Sec'y of Health & Human Serv.,* 667 F.2d 524, 538 (6th Cir. 1981) (pain alone may constitute a disability); *see also* 20 C.F.R. §404.1529. When evaluating pain or other symptoms, ALJs are required under the Regulations to consider all evidence, including medical history, medical signs and laboratory findings, the claimant's statements, and treating and other medical source opinions. 20 C.F.R. §404.1529(c)(1). Although the Regulations concerning pain and other symptoms are lengthy, the Sixth Circuit Court of Appeals has enunciated the applicable standard in "a more succinct" two-part analysis. *Felisky v. Bowen*, 35 F.3d 1027, 1038 (6th Cir. 1994). Part one considers "whether there is objective medical evidence of an underlying medical condition." *Id.* (citation omitted). If such objective medical evidence exists, then part two requires consideration of two alternative questions:

1.     Whether objective medical evidence confirms the severity of the alleged pain [or other symptom] arising from the condition; or

2.     Whether the objectively established medical condition is of

> such a severity that it can reasonably be expected to produce
> the alleged disabling pain [or other symptom].

*Id.* (citation omitted).

Neither *Felisky's* two-part test nor the Regulations upon which it is based require objective medical evidence of pain itself. *Id.* at 1039. The Regulations promise, "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. §404.1529(c)(2). Consequently, the Regulations require ALJs to consider a list of factors, including the claimant's daily activities; the location, duration, frequency and intensity of pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; treatment, other than medication, obtained for symptom relief; any measures used to alleviate pain (*e.g.*, lying flat, standing 15 or 20 minutes every hour, sleeping on a board, *etc.*); and other factors concerning the claimant's functional limitations. 20 C.F.R. § 404.1529(c)(3)(i)-(vii); *see* Social Security Ruling 96-7p.

An ALJ's findings concerning the credibility of a claimant's testimony about his or her pain or other symptoms "are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). "Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Id.* The Commissioner, speaking through the Rulings, mandates in part:

> The reasons for the credibility finding must be grounded in evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator to simply recite the factors that are described in the regulations for evaluating symptoms. The determination must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual

and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

Social Security Ruling 96-7p, 1996 WL 374186.

The ALJ noted in his decision, "An individual cannot be found disabled when he does not follow prescribed medical treatment unless he has 'good reason.'" (Tr. 25); *see* 20 C.F.R. §404.1530. Canup argues that he "has consistently complained of numbness in his hands and pain and numbness in his feet such that he has a burning sensation in his feet if he wears shoes and he has trouble using his hands." (Tr. 674, 679-80, 688-89, 707, 710-11); *see* Doc. #9 at 19. Canup contends that the ALJ should have credited this aspect of his testimony rather than finding that the record lacked medical documentation supporting the difficulties with his hands and feet. Canup points to the EMG findings as medical evidence in the record to confirm his testimony. The ALJ described the EMG findings as follows:

> There is only mild objective evidence ('subtle' findings) of peripheral neuropathy per an EMG in September 2002 (2F). While the claimant alleges mostly numbness in his hands and feet, there is no objective evidence of "persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station" as required by section 9.08A (diabetes mellitus) of the Listing of Impairments.

(Tr. 21). Dr. Danopolus, who examined Canup in March 2003, noted that the EMG showed diabetic neuropathy, but he also noted that Canup had a normal examination with his arms and legs, and observed "no evidence of nerve root compression or peripheral neuropathy." (Tr. 514). Manual muscle testing of Canup's hands was normal. (Tr. 517). Except for Dr. O'Connell's opinion, which the ALJ did not err in rejecting, *see supra*, §V(B), no physician has opined that Canup has any further limitations than those the ALJ found. Without such evidence, the ALJ was not required to credit Canup's testimony or his complaints of pain.

Accordingly, Canup's challenges to the ALJ's credibility determination lack merit.

## IT THEREFORE IS RECOMMENDED THAT:

1.      The Commissioner's final non-disability determination be affirmed, and

2.      This case be terminated on the docket of this Court.


February 25, 2009                                     ___s/ Sharon L. Ovington_____
                                                      Sharon L. Ovington
                                                      United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen (13) days (excluding intervening Saturdays, Sundays and legal holidays) because this Report is being served by mail.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981).